ROBERTS, J, for the Court.
 

 ¶ 1. This appeal arises from a property dispute over the boundaries of the Bounds Family Cemetery located in Lamar Coun
 
 *591
 
 ty, Mississippi. Richard Lenoir, Sandra Shakelford, and Miles Ezell (Miles), (collectively the Plaintiffs) heirs of Ephraim Bounds, brought suit in the Chancery Court of Lamar County to determine the rights of the parties to approximately 1.8 acres of land. The chancery court found that the entire 1.8 acres were to be burdened for use as a cemetery and entered a judgment in favor of the Defendants, William Anderson and William Yawn. The Plaintiffs filed multiple post-trial motions seeking either a new trial or amendment of the judgment. All post-trial motions were denied, and the Plaintiffs now appeal. Finding no error in the chancellor’s decision, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. Bounds acquired approximately forty acres of land in Lamar County from his brother, who had inherited the land from their father in 1882. Sometime after the conveyance, for a period of ten to fifteen years, Bounds lived in Texas and Louisiana, but he later returned home to Mississippi. Shakelford, Bounds’s granddaughter, testified that prior to returning to Mississippi to live, Bounds had buried his mother-in-law, Sarah Mason, behind his Mississippi home. By the time Bounds returned to Mississippi to remain, there were several other grave sites as well, so, at that time, he decided to move his home to another location. Later, a fence was erected around the area where the graves were located. The site where those early graves were located is the same .51 acre where the Bounds Family Cemetery is located today. At the time of trial, there were about 80 grave sites within the cemetery. Around 1914, Bounds designated approximately one acre for a family cemetery and one acre for a family school; the two acres are not contiguous but are in close proximity to each other. According to Shakelford’s testimony, Bounds memorialized his benevolent intentions in a will. The school never fully came to fruition, and it was abandoned after the family began utilizing public education. The land designated for the school has remained unproductive ever since. Regrettably, a copy of the will or other document, such as a deed, specifically stating Bounds’s intentions for future use, should the property cease to be used for its intended purposes, was not presented at trial, nor was it included in the record. However, other deeds recognizing the family cemetery were presented at trial.
 
 [1]
 
 Since the cemetery, encompassing .51 acre, has been continually used for the Bounds family, as well as friends of the Bounds family, the remaining 1.3 acres are at the heart of this dispute.
 

 ¶ 3. In 1938, Bounds conveyed an undivided half interest of the forty acres to his wife, and the land ultimately vested in this generation of heirs. After acquiring an interest in the property, Doris Bounds Ezell, Bounds’s youngest child and the mother of Miles, paid the taxes on the 1.8 acres.
 
 [2]
 
 However, after her death, her es
 
 *592
 
 tate and sons, David and Miles, failed to pay the property taxes on the 1.8 acres, and Miles was contacted by the Lamar County Tax Collector, Mr. Patterson,
 
 [3]
 
 who informed him that the property was about to be sold for the unpaid taxes. Patterson told Miles that “[t]he only way [to] ... ensure that nobody [bought] it from the family [was] to make it a historical cemetery.” Patterson presented the matter to the Lamar County Board of Supervisors (Board of Supervisors), and the property was indeed designated as a historical cemetery. The entire 1.8 acres were designate ed as a historical cemetery; the property was then excluded from the county’s tax rolls; and the owners have benefitted from the tax exempt status since 1991. Miles testified that he did not attend the Board of Supervisors’ meeting, and that he was not told about the designation and tax exempt status until after the meeting. Still, neither he, nor any other plaintiff, ever made any objection to the property’s designation as a historical cemetery.
 

 ¶4. Thereafter, David, Miles’s brother, conveyed his interest in the cemetery property to Anderson and Yawn through a cemetery warranty deed. Anderson testified that some of his ancestors were buried in the cemetery, and he and his family had helped maintain the cemetery since 1959. In 1994, Miles, Anderson, and Yawn raised money and constructed a new chain link fence around the cemetery because the original wooden fence had fallen into disrepair. Anderson testified that, at the time the new fence was erected, he wanted to extend the fenced area because it was common knowledge within the community that Bounds had left the entire 1.8 acres for cemetery use. Miles was hesitant and stated, “let’s just extend it out ... on all four sides and let the next generationf ] deal with it.” Despite Miles’s hesitancy, family tensions have caused this generation to deal with the matter.
 

 ¶ 5. When David conveyed his interest in the property to Anderson and Yawn, the intent was for them to continue to maintain the cemetery and provide additional burial space for family members of persons already buried there. Contending that the cemetery was not to extend past the original fenced area, the Plaintiffs brought suit in the Chancery Court of Lamar County to determine the rights of the parties to the entire 1.8 acres. After considering the actions of the Bounds family, their friends and neighbors, and the families of all of those buried in the Bounds Family Cemetery, the chancellor determined that a preponderance of the evidence established that the entire 1.8 acres were burdened with a limitation of use for cemetery purposes and should remain available for such purposes in the future. Aggrieved by the chancellor’s decision, the Plaintiffs now appeal.
 

 STANDARD OF REVIEW
 

 ¶ 6. “[This] Court employs a limited standard of review on appeals from chancery court.”
 
 Reddell v. Reddell,
 
 696 So.2d 287,
 
 288
 
 (Miss.1997) (citation omitted). “[T]his Court will accept the chancellor’s finding[s] of fact as long as the evidence in the record reasonably supports those findings.”
 
 In re Estate of Chambers v. Jackson,
 
 711 So.2d 878, 880(¶8) (Miss.1998)
 
 *593
 
 (citation omitted). “That means we will not disturb the findings of a chancellor unless those findings are clearly erroneous or an erroneous legal standard was applied.”
 
 Lee Hawkins Realty, Inc. v. Moss,
 
 724 So.2d 1116, 1118(¶8) (Miss.Ct.App.1998). However, “[w]hen presented with a question of law ... we conduct a de novo review.”
 
 In re Will of Carney v. Carney, 758
 
 So.2d 1017, 1019(¶ 8) (Miss.2000).
 

 DISCUSSION
 

 ¶ 7. The Plaintiffs raise the following issues on appeal: (1) whether the chancery court erred in its decision to use extrinsic evidence and mere conjecture to construe an unambiguous deed, (2) whether the chancery court erred in treating the Board of Supervisors’ property tax exemption of cemetery property as a grant of land, and (3) whether the chancery court’s opinion failed to adequately adjudicate the rights of the parties in regard to the location of the cemetery. As they may be consolidated, we will address Issues I and II together.
 

 I. THE TRIAL COURT’S USE OF EXTRINSIC EVIDENCE
 

 ¶ 8. Bounds’s will of 1914 was not presented at trial, nor was it included in the record. Also, the warranty deed to Marguerite simply stated that “less than two acres were for cemetery purposes.” As a result, there was, and is, no way to discern what Bounds’s intentions were without considering extrinsic evidence. The law is clear about the construction of deeds or contracts. The supreme court has stated the following:
 

 The rules for the construction of deeds or contracts are designed to ascertain and to follow the actual or probable intention of the parties and are [as follows]: When the language of the deed or contract is clear, definite, explicit, harmonious in all its provisions, and free from ambiguity throughout, the court looks solely to the language used in the instrument itself, and will give effect to each and all of its parts as written.
 
 When, however, the language falls short of the qualities above mentioned and resort must be had to extrinsic aid, the court will look to the subject matter embraced therein, to the particular situation of the parties who made the instrument, and to the general situation touching the subject matter, that is to say, to all the conditions surrounding the parties at the time of the execution of the instrument, and to what, as may be fairly assumed, they had in contemplation in respect to all such said surrounding conditions, giving weight also to the future developments thereinabout which were reasonably to be anticipated or expected by them;
 
 and when the parties have for some time proceeded with or under the deed or contract, a large measure, and sometimes a controlling measure, of regard will be given to the practical construction which the parties themselves have given it, this on the common sense proposition that actions generally speak even louder than words.
 

 Farragut v. Massey,
 
 612 So.2d 325, 329 (Miss.1992) (emphasis added) (citation omitted). With this in mind, we look to case law to determine if the chancellor acted within his discretion when he determined that the entire 1.8 acres should be used for benevolent, or eleemosynary, purposes rather than allowing the land to revert to the Plaintiffs.
 

 ¶ 9. In
 
 Nicholson v. Myres,
 
 170 Miss. 441, 448, 154 So. 282, 283 (1934), a case in which land was left to the City of Natchez for use as a cemetery, the supreme court stated that “[the] failure of the city to use the land as a cemetery did not cause it to revert to the grantor or his heirs; that the
 
 *594
 
 title to land sold and conveyed for a designated use will not revert to the grantor or his heirs upon being put to another or different use,
 
 in the absence of express terms in the deed providing for reversion.”
 
 (Emphasis added).
 
 [4]
 
 It is an old and established principle in property law that a possibility of a reverter to the grantor or his heirs must be expressly stated in the instrument. The supreme court stated a century ago that “[i)n order that a condition subsequent may be created, the breach of which will cause the land conveyed to revert to the grantor, it must clearly appear that such was the grantor’s intention.”
 
 Soria v. Harrison County,
 
 96 Miss. 109, 114, 50 So. 443, 444 (1909) (citation omitted). The
 
 Soria
 
 court found that in the absence of technical words such as “provided, so long as, until, [and] etc.” that a condition subsequent was not created.
 
 Id.
 
 The court went on to state that “[n]o right of re-entry was reserved by the grantor on any contingency- [Therefore,] [t]he authorities show that the recital of the consideration and a statement of the purpose for which the land is to be used are wholly insufficient to create a conditional estate.”
 
 Id.
 
 at 115, 50 So. at 444.
 

 ¶ 10. In another analogous case, in which land was given for use as a courthouse and prison but it was no longer being used for those purposes, the United States Supreme Court stated, “if we disregard the absence of technical terms or provisions importing a condition or limitation, and examine the deed with a view of eliciting the clear intention of the parties, we are driven to the conclusion that it was the intention of the grantors to convey their entire estate in the land.”
 
 Stuart v. Easton,
 
 170 U.S. 383, 398, 18 S.Ct. 650, 42 L.Ed. 1078 (1898). In other words, the court will try to determine the intent of the person who made the devise, and if there is no express language in the instrument for the property to revert back to the grantor or his/her heirs when the property is no longer used for the stated/intended purpose, it will be concluded that the grantor intended to convey his entire interest in the property.
 
 See Tinnin v. First United Bank,
 
 502 So.2d 659, 663 (Miss.1987). Furthermore, the court may look to parol or extrinsic evidence if the grantor’s intentions are not clear from the four corners of the document.
 
 Id.
 
 at 670. Since the Plaintiffs did not produce the will or evidence that Bounds’s intentions were to retain a reversion in the land, the chancellor was well within his discretion to rely on parol or extrinsic evidence and deny the Plaintiffs’ request that the 1.3 acres, which was not being used for a school, be divided among the heirs or partitioned and sold.
 

 ¶ 11. The Plaintiffs rely on the case of
 
 Stuart v. Smith,
 
 344 So.2d 127 (Miss.1977), for their contention that the cemetery should be confined to the .51 acre. They argue that
 
 Stuart
 
 instructs that “the dimensions ... [of] the actual burial ground [should] govern.” We disagree. The
 
 StuaH
 
 case addressed a dispute over the use of a quarter
 
 of
 
 an acre surrounding a cemetery of antiquity.
 
 Id.
 
 at 128. In
 
 Stuart,
 
 the grantor conveyed land by a warranty deed that contained the following language: “Excepting and reserving therefrom one quarter of an acre in square form surrounding the present graveyard with necessary rights to and from said graveyard at any and all times for the use of the heirs of M.C. Stuart, deceased.”
 
 Id.
 

 ¶ 12. Although the deed in
 
 StuaH,
 
 as in the instant case, did not contain a legal description of metes and bounds, the court adopted the perimeter of the cemetery
 
 *595
 
 depicted on a drawn map.
 
 Id.
 
 Also, resistivity tests were done by an archeologist and a civil engineer to ascertain where the actual grave sites were located.
 
 Id.
 
 at 129. The court determined that the cemetery should be confined to what it was at the time of the conveyance, and that the grant- or had intended to maintain an easement for the graveyard.
 
 Id.
 
 at 180. In other words, the court maintained the easement around the cemetery. We do not find that
 
 Stuart
 
 contradicts the chancery court’s holding in the instant case, as the
 
 Stuart
 
 court simply tried to discern the grantor’s intentions and then continued the intended charitable use.
 
 Stuart
 
 differs from the instant case in the following ways.
 

 ¶ 13. First, unlike the parties in
 
 Stuart,
 
 the parties in the instant case have not presented a deed from which the court can consider whether any similar excepting and reserving language exists, or whether any other language supports an argument for or against the restriction or expansion of the .51 acre. Second, in
 
 Stuart,
 
 the quarter-acre at issue, which surrounded the perimeter of the cemetery, was specifically addressed in the deed and related to that cemetery. Here the issue concerns land that was originally intended for a separate charitable use. And third, at the point when litigation ensued, the cemetery in
 
 Stuart
 
 had not been used for new burials for over sixty years; the Bounds Family Cemetery has been in continuous use, with new grave sites added within the past couple of years.
 

 ¶ 14. The holding in
 
 Stuart
 
 supports the principle that deeds are to be construed according to their plain language if they are unambiguous, and the chancellor may look to parol or extrinsic evidence when they are not. The
 
 Stuart
 
 court also acknowledged that the descendants or intended beneficiaries of a cemetery should have reasonable use of and access to an established cemetery, and the court addressed the judicially recognized custom of “people ... buryfing] their relatives together or in the same cemetery as far as reasonably possible.”
 
 Id.
 
 at 129 (quoting
 
 Morgan v. Collins Sch. House,
 
 160 Miss. 321, 133 So. 675 (1931)). In the instant case, the deed to Marguerite indicates that Bounds family members have acknowledged that the 1.8 acres were to be used as a cemetery for at least forty-three years, and both the Plaintiffs and the Defendants testified they have family members buried in the cemetery. These facts bolster the chancellor’s decision to expand the boundaries to encompass the unused 1.3 acres.
 

 ¶ 15. The instant case does not deal with a gift to an established charity or trust. However, given that Shakelford testified that Bounds’s intentions were for the entire two acres to be used for charitable purposes, we find the doctrine of equitable approximation and/or the cy pres doctrine provides cogent support for the chancellor’s ruling.
 
 [5]
 
 The supreme court has addressed the problem that arises when the intended purpose for a gift is no longer feasible and stated, “the duty of the court is to carry out the grantor’s intentions .... [And if the original charitable gift or use fails] the property will not revert back to the settlor or his heirs.... ”
 
 Miss. Children’s Home Soc’y v. Jackson,
 
 
 *596
 
 230 Miss. 546, 555, 93 So.2d 483, 487 (1957). The court went on to say that the “[c]y pres [doctrine or the doctrine of approximation] will not be applied where the settlor has made an express provision for an alternative disposition of his property, if the charity as he planned it proves impossible, inexpedient, or impractical.”
 
 Id.
 
 at 556, 93 So.2d at 487. However, in the absence of an express provision, the doctrine of approximation is a basic part of equity jurisdiction. It is a rule of judicial construction designed to carry out the intention of the donor, and it is applicable to devises.
 
 See Carter v. Berry,
 
 243 Miss. 321, 375, 140 So.2d 843, 854 (1962) (citation omitted).
 

 ¶ 16. When addressing the abandoned school property, the chancellor stated, “it also might be surmised that [Bounds] wanted, or would have wanted, that land intended for one of his eleemosynary purposes could remain available for the other.” Looking at established case law and the evidence presented in the record, we find that the chancellor did not abuse his discretion, nor was he manifestly wrong when he arrived at the conclusion that the 1.3 acres should continue to be used for charitable purposes. Furthermore, we find that the chancellor was well within his discretion when he considered the Plaintiffs’ acquiescence to the Board of Supervisors’ designation of the property as a tax exempt historical cemetery. Although not completely applicable to the instant case, the chancellor was not too far afield when he touched upon the equitable doctrine of estoppel.
 

 ¶ 17. The supreme court has stated, “[t]he principle on which the doctrine of estoppel by conduct rests is that it would be a fraud in a party to assert what his previous conduct had denied, when on the faith of that denial others have acted. When silence becomes a fraud, it will operate as an estoppel.”
 
 Staton v. Bryant,
 
 55 Miss. 261, 272 (1877). We do not state that the Plaintiffs’ actions were fraudulent. However, it does not escape us that, although they now maintain that the 1.3 acres for the school were never to be used for a cemetery and should be divided among them, they allowed the Board of Supervisors to designate
 
 the entire 1.8 acres
 
 as a historical cemetery to protect them from possibly losing the property in a tax sale. They also allowed the Board of Supervisors to shield them from taxes on the property for approximately sixteen years. The Board of Supervisors’ minutes were public record, and as stated, at least one of the Plaintiffs knew that the entire 1.8 acres were designated as a cemetery. As the supreme court has observed, “acquiesce[nce] by ... silence ... amount[s] to a tacit agreement....”
 
 York v. Haire,
 
 236 Miss. 711, 715, 112 So.2d 245, 246 (1959). The Plaintiffs’ silence resonates with the sound of agreement.
 

 ¶ 18. This view was furthered by the United States Supreme Court in
 
 New Jersey v. New York,
 
 523 U.S. 767, 786, 118 S.Ct. 1726, 140 L.Ed.2d 993 (1998). The Supreme Court acknowledged that “[t]he doctrine of prescription and acquiescence ‘is founded upon the supposition, confirmed by constant experience, that every person will naturally seek to enjoy that which belongs to him; and the inference fairly to be drawn from his silence and neglect, ... [is] his intention to relinquish it.’ ”
 
 Id.
 
 (citation omitted). The Plaintiffs were content to remain silent and relinquish the responsibilities of ownership for sixteen years in order to maintain the status quo. Therefore, we support the chancellor’s finding that the Plaintiffs’ silence indicates agreement with the designation of the entire 1.8 acres as a historical cemetery.
 

 ¶ 19. The Plaintiffs complain that no petition was made by them to the
 
 *597
 
 Board of Supervisors to designate the entire 1.8 acres as a cemetery, and they argue that the Board of Supervisors “expropriate[d] private property to establish a private cemetery.” We find that argument is without merit. Mississippi Code Annotated section 41-43-1(2) (Rev.2005) states the following: “The Board of Supervisors of any county is authorized and empowered, upon petition and request to do so, to establish or designate the location of any private family cemetery to be located in the county.” The Defendants correctly argue that the statute at issue does require a petition and request, but it is silent on how the petition must be made.
 

 ¶ 20. The record reveals that the Plaintiffs are, at least, in part responsible for the property’s designation as a historical family cemetery. In an effort to keep the property from being sold in a tax sale because of unpaid property taxes, Patterson approached the Board of Supervisors
 
 on the Plaintiffs’ behalf
 
 and procured forgiveness of the tax debt owed, as well as relief from future taxes. By his own testimony, Miles admitted that he was told
 
 before
 
 the meeting that the only way Patterson could ensure that the family property was not sold was to have it designated as a family cemetery. Although he may not have personally gone before the Board of Supervisors, Miles knew what Patterson’s intentions were. Accordingly, the Plaintiffs’ argument that a petition was not adequately made to the Board of Supervisors fails. The Board of Supervisors did not act independently of the Bounds family; it acted upon their petition and request via Patterson. This issue is without merit.
 

 II. ADJUDICATION OF THE RIGHTS OF THE PARTIES IN REGARD TO THE LOCATION OF THE CEMETERY
 

 ¶21. On appeal, the Plaintiffs argue that the chancellor should have declared the rights of the parties and who could use the cemeteiy. In other words they asked, “who has the right to be buried where?” At the same time the Plaintiffs filed their complaint, they filed a motion for a temporary restraining order requesting that the Defendants be prohibited from “burying, causing to be buried, or giving others permission to be buried on the land conveyed in that Cemetery Warranty Deed_” Their complaint also requested that the “court de-termin[e] the ownership interest and boundaries of the property known as the Bounds Family Cemetery ... [as well as the] ownership interest of the remaining property....” But, in them pleading, the Plaintiffs did not ask the court to determine who “has the right to be buried where?”
 

 ¶ 22. “One of the most fundamental and long-established rules of law in Mississippi is that the [appellate court] will not review matters on appeal that were not raised at the trial court level.”
 
 Shaw v. Shaw,
 
 603 So.2d 287, 292 (Miss.1992) (citation omitted). At the beginning of the trial, the parties stipulated that ownership of the property was as follows: Miles, one-sixth interest; Shakelford, one-third interest; Lenoir, one-third interest; Anderson, one-twelfth interest; and Yawn, one-twelfth interest. The court acknowledged the Plaintiffs’ contention that the deed to Anderson and Yawn was not valid. However, the court refused to address it finding that only the parties to the document could litigate the matter, and the grantor, David, was not present. Since the ownership of the property had been addressed, the only remaining issues for the court to determine were the boundaries of the cemetery and whether the 1.3 acres outside of the recognized Bounds Family Cemetery
 
 *598
 
 could be used as a cemetery; not who had the right to be buried where. Therefore, the issue of whom can be buried in the cemetery and where they may be buried is not properly before this Court.
 

 ¶ 23. In the absence of a deed or will from Bounds, the chancellor was correct in looking to extrinsic evidence to determine Bounds’s intentions concerning the future use of the property. Also, in the absence of proof that Bounds intended to maintain a reversion, the chancellor correctly surmised that the 1.3 acres originally intended for a school should continue to be used for eleemosynary purposes. We find that the chancellor’s findings of fact and decree were based upon substantial evidence and sound legal principles. This issue is without merit.
 

 ¶ 24. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
 

 KING, C.J., MYERS, P.J., IRVING, GRIFFIS, BARNES, ISHEE, CARLTON AND MAXWELL, JJ„ CONCUR. LEE, P.J., NOT PARTICIPATING.
 

 [1]
 

 . The record includes a warranty deed conveying property to Marguerite Bounds Lenoir (Marguerite) in 1966, which, after giving the legal description of the property, stated a limitation that
 
 “less than 2 acres [were] for cemetery purposes.’’
 
 Also, there is the cemetery warranty deed from David Ezell (David) to Anderson and Yawn. It includes the same legal description, minus tire stated limitation of two acres for cemetery use. The absence of the stated use on the deed to Anderson and Yawn does not defeat the parties’ intentions of how the property should be used. It was, after all, a "cemetery” warranty deed.
 

 [2]
 

 . The record reflects the following passage quoted from the Lamar County Board of Supervisor’s minutes:
 

 Doris Bounds was deeded a parcel of land ... which included the subject parcel, and[,] at the that time[,] and is now known
 
 *592
 
 as the Bounds Cemetery. Subsequently, Doris Bounds married and became Doris Ezell and died in 1987, and the estate of Doris Ezell was probated and the property divided among the two sons, Miles Ezell and David Ezell....
 
 The subject properly, 1.8 acres, was excluded from the probate, as it had been a cemetery for approximately 100 years.
 

 [3]
 

 . The record does not reflect the first name of Mr. Patterson.
 

 [4]
 

 .
 
 See, Thornton v. Natchez,
 
 88 Miss. 1, 17, 41 So. 498, 500 (1906).
 

 [5]
 

 . When dealing with charitable gifts that are no longer feasible, the court may apply the cy pres doctrine. "This is an equitable doctrine under which a court reforms a written instrument with a gift to a charity as closely to the donor’s intention as possible, so that the gift does not fail.” Black's Law Dictionary 173 (3rd pocket ed.2006). Likewise, when dealing with a trust, the court will apply the doctrine of approximation, which "authorizes a court to vary the details of a trust’s administration to preserve the trust and to carry out the donor’s intentions.” Black’s Law Dictionary 221 (3rd pocket ed.2006).